24 So.2d 156

**PENNINGTON v. DREWS.**

No. 37888.

Nov. 5, 1945.

Rehearing Denied Dec. 10, 1945.

John Fred Odom and Fred G. Benton, both of Baton Rouge, for applicant.

Watson, Blanche, Fridge & Wilson, of Baton Rouge, and Davidson & Davidson, of Lafayette, for respondent.

HAMITER, Justice.

On the filing of this action, the basis of which is a written contract entered into between the parties hereto, the district court granted at the request of plaintiff, C. B. Pennington, a temporary restraining order enjoining defendant, T. J. Drews, from doing certain acts prohibited by the agreement, and further the court directed him to show cause why a preliminary writ of injunction should not issue.

To the rule nisi, on the date designated for its hearing, defendant tendered exceptions of no right and no cause of action and an answer. The exceptions, on being considered separately, were sustained, and, accordingly, it was decreed that the rule be dismissed, the preliminary injunction denied, and the previously issued temporary restraining order recalled, all at the cost of plaintiff.

To obtain a review of that decision, plaintiff successfully invoked the supervisory jurisdiction of this court, presenting for our consideration the single question of whether or not he, under the allegations of fact of his petition, has stated a right and a cause of action for the prohibitory relief sought.

Plaintiff, in his petition, alleges in part as follows:

"That for approximately 20 years prior to 1940 petitioner had been engaged in the oil business, buying and selling oil leases and mineral rights, for his individual ac-

count and upon a brokerage basis, promoting and developing oil properties for himself and for others, and devoting his full time to the oil business generally, and in such a way as to fully familiarize petitioner with oil development, and with the methods employed by oil men and oil companies in carrying on such enterprise.

"That prior to the 7th day of October, 1940, one T. J. Drews, a resident of lawful age of the Parish of East Baton Rouge, State of Louisiana, represented to petitioner that he was the inventor and sole owner of a certain electrical instrument known as an 'Atomiscope' that could be successfully employed in geophysical work in determining the presence of structure or fault favorable for the accumulation of oil and gas.

"That he represented to petitioner at that time that due to financial difficulties and inability on his part to make the proper contacts he had been unable to develop the device for the purposes shown, and that he desired to become employed and associated with petitioner, who had knowledge of exploration and development of oil, gas and other minerals, and numerous contacts with oil owners and oil developers, so that he could improve upon the methods for operating the said device and so that he could demonstrate its practical and commercial value, and reap the benefits thereof.

"That thereupon petitioner allowed the said T. J. Drews to demonstrate the instrument in question and worked with him in its use and operation for a limited period of time, and found that while it offered some prospect for practical and helpful usage in making geophysical tests that

it was necessary for much work to be done and for a great amount of testing and experimentation to be carried out before any reliable commercial results could be obtained.

"That taking into account the potentialities mentioned and further considering the prospect even though remote that improvement might be made in the method of operation which would make the said instrument of some value in determining the presence of structure or faults favorable for the accumulation of oil or gas, on October 7, 1940, petitioner signed a contract with the said T. J. Drews, a true and correct photostatic copy of which is attached hereto and made a part of the present petition as if written herein in extenso."

The mentioned contract of date October 7, 1940, insofar as pertinent here, contains the following provisions:

"That Whereas, T. J. Drews represents that he is the inventor and sole owner of certain electrical instruments known as the 'Atomiscope' that is useful in the application of geophysical work, in determining the presence of structure or faults favorable for the accumulation of oil or gas. The instrument or instruments may be classified as an electrascope with isolation properties and detecting qualities that may be applied to oil exploration work. The atomiscope undertakes to give the highly metamorphic state of foraminiferous particles as a line substance and the oil substance as a converted compound having oil character embodying compound substances with singular electrical characteristics, and consequently may be used to

determine other minerals such as salt, sulphur and etc., and,

"Whereas, the said T. J. Drews being the sole owner of the Atomiscope he also has the sole rights to contract for the exclusive use of said instrument or instruments, and,

"Whereas, the said T. J. Drews desires to become employed and associated with someone who has knowledge of exploration and development of oil, gas and other minerals in order that he might work, and conduct geophysical surveys and point out lands and places favorable for production of oil, gas and other minerals, in order that the merits of his instruments might be further advanced, and,

"Whereas, C. B. Pennington having had experience in exploration and knowledge in the oil business and is willing to take and observe the instrument now owned by said T. J. Drews which instruments the said Pennington is fully familiar with,

"Now, therefore, for and in consideration of the sum of Three Hundred and No/100 ($300.00) Dollars, cash, and other good, valuable and adequate considerations paid by the said C. B. Pennington to the said T. J. Drews, the said T. J. Drews does hereby accept employment and grants to the said C. B. Pennington the exclusive right and exclusive use of his services in the operation of said instruments as well as the exclusive use of said instruments in which the said T. J. Drews claims to be able to detect the presence of oil, salt, sulphur and other minerals, for a period of four (4) months from and after this date, upon the further payment

by C. B. Pennington to the said T. J. Drews, the sum of Three Hundred and No/100 ($300.00) Dollars per month for three (3) additional months, the first month being paid on the signing of this contract, and future payment being due on the 7th day of each month thereafter.

\* \* \* \* \* \*

"The Atomiscope or instruments referred to herein shall at all times remain the property of said T. J. Drews and shall at all times be in his possession and be operated by him personally, it further being understood that such surveys are to be conducted only in the United States, without first having secured a written consent from the said T. J. Drews.

"The said T. J. Drews agrees to never purchase, either directly or indirectly, for his account any leases in any area that has been surveyed out in accordance with this contract, without first securing the consent of C. B. Pennington or his duly authorized agent.

"During the terms of this contract the said T. J. Drews agrees to never loan, give, sell, make new, replace, experiment, survey or demonstrate said atomiscope or instruments to or for any other person, firm or corporation without first securing the consent, and then in writing, of C. B. Pennington, or his duly authorized agent.

"The said T. J. Drews agrees that any improvement or new discoveries affecting said instruments, while under employment of this contract, shall inure to the benefit of this contract.

"The said T. J. Drews agrees to never divulge where any survey has been made, during the terms of this contract, pass upon

its merits, commit or commute the same to another whereby said person, firm or corporation might be in position to take advantage of said information or survey, without first securing the consent of C. B. Pennington or his duly authorized agent.

"It being understood and agreed that the said T. J. Drews shall always remain faithful to the cause and at all times be diligent in his respective duties, both honestly and proficiently, and shall be ready and willing at all times to do survey or exploration work with his Atomiscope or instruments when called upon to do so. The said T. J. Drews agrees to keep the said Atomiscope or instruments in good working conditions at all time.

"The said T. J. Drews recognizes that in work of this character that time element is an important factor and that under this contract the said C. B. Pennington will have a running overhead expense, over and above the salary paid to the said T. J. Drews, therefore, it is agreed that should the said T. J. Drews not accept or for any reason, other than herein provided, refuse or delay the work call or for any reason, refuse to work with or take the Atomiscope or instruments out after he has been called, then, and in that event the said C. B. Pennington shall have the right to charge the said T. J. Drews account, with the right to deduct the same from his salary and all rights to collect, with each and every day that he does not work, after he has been called, the sum of Twenty-five and no/100 ($25.00) Dollars per day; and, in addition thereto the said T. J. Drews shall be held responsible for any loss or damage the said C. B. Pennington might sustain

through his refusal, neglect or otherwise to accept the work call, personal sickness or personal injury whereby the said T. J. Drews is incapable to work is hereby excusable."

Plaintiff further alleges:

"That this contract was carried out on the part of both parties up to February 6th, 1941, upon which date a new agreement was made and executed between them, which was supplemental to the said original agreement and which had the effect of changing the compensation to be paid to the said T. J. Drews and which extended the contract to January 7th, 1942, and gave to petitioner the optional right to continue to extend it for additional periods of twelve months dated from January 7th, 1942, not exceeding, however, ten years from that date.

"That a true and correct copy of the latter agreement is likewise attached hereto and made a part of the present petition as if written herein, and that except in the respects noted the original agreement was maintained in full force and effect between the parties.

"That the said contract as amended and extended was maintained in full force and effect and carried out between the parties up to and inclusive of January 6 of 1944, subject to one period of about three months during which the said T. J. Drews obtained a leave of absence in order to devote extra time and attention to some personal business.

"That on January 3rd, 1944, in accordance with the provisions of the said supplemental agreement petitioner notified the

said T. J. Drews in writing of petitioner's desire to exercise his option to extend the contract for another year starting January 7th, 1944, all as is shown by a true copy of said written notice, together with the return registered receipt signed by the said T. J. Drews on January 4, 1944, attached hereto and made a part of the present petition as if written herein in extenso.

"That in pursuance to the said notice on January 6th, 1944, petitioner mailed to the said T. J. Drews a check in the sum of $328.50, representing salary for the month of January, 1944, less Government required deductions set out upon an attached statement, as is shown by a true copy of the letter accompanying said remittance attached hereto and made a part of the present petition as if written herein in extenso.

"That on January 10th, 1944, the said T. J. Drews, without any cause or justification repudiated his contractual obligations to petitioner in a letter of that date, attached hereto and made a part of the present petition to show the rem ipsem, in which he claimed that his health prevented him from continuing geophysical work, and stated peremptorily and unequivocally that the said contract was terminated, and that there was no longer any legal responsibility on his part to perform the obligations thereof, and in which he returned the said salary check, likewise attached hereto and made part of the present petition."

The supplemental agreement of February 6, 1941, changed the monthly compensation provisions of the original contract so as to read:

"Therefore, it is agreed between the parties hereto that the salary of the said T. J. Drews shall be Two Hundred and No/100 ($200.00) Dollars per month, from and after February 7th, 1941, payable in advance, for the next ten (10) months.

"On or before January 7th, 1942, the said C. B. Pennington shall have the right and option, by so notifying the said T. J. Drews in writing, to extend this contract for an additional twelve (12) months, by the payment of Three Hundred Fifty and No/100 ($350.00) Dollars per month, as salary, to the said T. J. Drews. In like manner (by notifying the said T. J. Drews in writing on or before the 7th day of January of each year) and like payments, ($350.00) per month, this contract may be extended for successive periods of twelve (12) months each, not exceeding ten (10) years from and after January 7th, 1942."

Continuing, the supplemental contract provided:

"In addition to the above mentioned salary, the said C. B. Pennington agrees to carry the said T. J. Drews for twenty-five (25%) per cent of the net profits, (by this is meant, 25% of the profits after paying all office rent, office help or office expenses of every nature, advertising, traveling or car expenses, salaries, lease costs, commissions, interest to others, interest on borrowed money, legal, accounting, general operating, equipment, development, experimental, marketing, taxes of all nature and kind, both state and federal,

or any other expenses connected with said operations, and in addition thereto allowing C. B. Pennington a salary of Five Hundred and No/100 ($500.00) Dollars per month, derived by C. B. Pennington as a result of any contract work, surveys or exploration work conducted for any company or individual, other than C. B. Pennington. The manner, method, form or time of securing or deriving at, and receiving said profit, as well as any and all operations, of every nature and kind, shall be left to the sole and final judgment and discretion of the said C. B. Pennington."

It was also stipulated in the supplemental agreement that T. J. Drews would receive a working interest, or in lieu thereof an overriding royalty, in all oil leases that Pennington might acquire for his own account as a direct result of surveys made with the Atomiscope.

Following a detailing in the petition of several active breaches by defendant of contracted obligations, among which were defendant's lending his services and employing the said instrument both for the benefit of himself individually and for others, plaintiff alleges additionally:

"Now petitioner shows that he is incurring and will hereafter during the whole life of said contract incur irreparable injury and loss that cannot possibly be compensated by any possible award in damages if the said T. J. Drews is permitted to continue the activities complained about, and that petitioner has no adequate remedy at law, and no way to protect his rights and interests in the said instrument and in the personal exclusive services of the said

T. J. Drews in the operation thereof unless specific performance and injunctive relief herein sought are granted.

"In this connection petitioner shows that prior to October 7th, 1940, petitioner had cooperated with the said T. J. Drews in the invention and development of a similar device and had spent a sum in excess of $5,000.00 out of his personal funds in connection therewith, and that in October of 1940 when the first contract was signed the said Atomiscope had not been developed by the said T. J. Drews to the point where it had any practical or commercial value whatever, for oil exploration purposes or otherwise, and that indeed it was not until some time in the first months of 1942 that it began to attain a satisfactory degree of proficiency in the results obtained, and that during this whole time petitioner devoted the major portion of his personal efforts to experimentation with the said instrument, and personally attended upon and participated in every survey made in the field, or otherwise.

"That in addition to paying the said T. J. Drews' regular salary petitioner expended large sums of money, running into thousands of dollars, to provide the expense and overhead for hundreds of surveys, and to complete tabulations thereof, that were made for no other purpose than to improve the method of operating said instrument, and to demonstrate the said instrument's practical and commercial value.

"That the said T. J. Drews was of very limited knowledge as to oil exploration, and that he had no knowledge of mapping and survey recordings whatever, and that

he had no contact with oil men or oil companies to speak of, and no background that would have enabled him to carry out these experiments without petitioner's cooperation; and that as a result of these efforts, to which petitioner materially contributed in the respects shown, the practical approach and method of operating the said Atomiscope was vastly improved until highly satisfactory results were obtained, and a record was built up and recorded under petitioner's direction and supervision of a nature which demonstrated to the oil fraternity generally the highly desirable advantages in geophysical work carried on with the benefit of said instrument.

"That down to the present time petitioner has received no return of any kind commensurate with the time and money which he has invested under said contract.

"That as petitioner's substantial rights and interests depend primarily upon the use to which the said Atomiscope is hereafter put in accordance with the terms and provisions of said contract, and the results that may be obtained under any surveys hereafter made, and that as all of this is to some extent speculative and uncertain despite the fact that the said device has now been made adaptable to oil exploration purposes, and has been improved to a point making it possible to obtain the high degree of proficiency shown, that there is no way by which petitioner could be protected by a suit in damages for the breach of said contract on the part of the defendant that may be instituted now or hereafter."

■ Plaintiff prays for specific performance of the contract, for injunctive (prohibitory) relief, and for a judgment awarding certain penalties. As before shown, however, only the matter of the injunctive relief is presently before us, and it is to be considered solely in connection with defendant's exceptions of no right and no cause of action directed to the allegations of fact of the petition, which, for the purpose of the consideration, are to be accepted as true.

The exceptions, sustained by the trial court, are based on the following grounds: 1. That the contract is lacking in mutuality, is contracted on a potestative condition and is, therefore, a nudum pactum. 2. That plaintiff's petition does not show that he will suffer irreparable injury or that he does not have an adequate remedy at law. 3. That injunction will not lie on personal service contracts.

■ In arguing that the contract is predicated on a potestative condition, which under Revised Civil Code Articles 2024 and 2034 renders it null and void, defendant says: "The cash consideration stated in said contract is for salary, which means the recompense or consideration stipulated to be paid to a person for services, * * * therefore, the only consideration for the exclusive use of the instrument was the profits which Drews might derive from its use." Further he declares that such profits—the real cause of the contract—were contemplated to be made through Atomiscope operations in dealing with oil lands, leases, etc., he having reference to

the paragraph providing for his receiving 25% of the net profits derived by Pennington as a result of any surveys or exploration work conducted for third persons. "Here the real profit would be found, here the parties expected to find large financial rewards." Yet, he points out, the contract provides that: "The manner, method, form, or time of securing or deriving at, and receiving said profits, as well as any and all operations, of every nature and kind, shall be left to the sole and final judgment and discretion of the said Pennington." Concluding, defendant insists that since Pennington has complete discretion in the obtaining of the contemplated profits, which constitute the real cause and consideration for his granting the exclusive use of the instrument, their agreement is contracted on a potestative condition and is a nudum pactum.

If defendant's interpretation of the contract were correct there might be merit to the conclusion reached. But the argument, it appears to us, is founded on the false premise that the monthly cash payments to Drews was only for services rendered and that the contemplated profits constituted the sole consideration for the granting of the instrument's exclusive use.

As we interpret the contract Pennington agreed to pay the stipulated monthly compensation to Drews not only for the latter's services but also for the exclusive use of the instrument. In the paragraph of the original agreement describing such compensation, it is said that Drews "does hereby accept employment and grants to the said C. B. Pennington the exclusive right and exclusive use of his services in the operation of said instruments *as well as the exclusive use of said instruments* * * *." The supplemental agreement changed that paragraph only to the extent of the amounts of the monthly payments; it in no manner affected the purpose for which the compensation was payable. (Italics ours.)

According to the allegations of the petition the agreed monthly compensation has been fully paid by plaintiff. Whether it was adequate consideration for both defendant's services and the exclusive use of the instrument is a question not presented for decision. Clearly, however, it amounted to a serious consideration and was a primary cause of the contract.

When the agreement was entered into the Atomiscope was unproven. It was then the desire of Drews, as the contract recites, "to become employed and associated with some one who has knowledge of exploration and development of oil, gas and other minerals in order that he might work, and conduct geophysical surveys and point out lands and places favorable for production of oil, gas and other minerals, in order that the merits of his instruments might be further advanced * * *." Pennington possessed the mentioned knowledge, having had much experience in the oil business, and he was willing to employ and become associated with Drews and to assist in the advancement of the instrument's merits. Through the employment by and association with Pennington, the desire of Drews was satisfied; he was afforded the opportunity of experimenting

with and perfecting his invention, and, at the same time, he received monthly compensation as well. The principal advantage for which Pennington paid, it appears, was the locating of oil leases, through the use of the instrument and the services of Drews, which he purchased for the account of others at their instructions in the regular course of his brokerage business.

Merely incidental to the contract, and clearly independent of its primary purpose clause, is the controversial provision that Drews would receive 25% of the net profits obtained by Pennington as a result of contract work conducted for third persons, the manner, method, etc., of deriving such profits being left to Pennington's discretion. By no means does that provision qualify or modify the cash consideration stipulation. It was inserted obviously for the purpose of granting to Drews additional benefits if the instrument improved to such an extent that Pennington could and did use it in the conducting of surveys and exploration work with third persons and receive profits therefor. In that event Drews as well as Pennington would participate in the revenues so obtained. But the performance of these operations for others was at the option or election of Pennington. For Drews' services and the exclusive use of the instrument, which were obtained primarily to aid in the conducting of his brokerage business, Pennington obligated himself only to pay the monthly compensation and necessary expenses. This obligation has been fully discharged.

In support of the position of defendant, his counsel cite numerous cases in our jurisprudence in which contracts, or particular parts thereof, were annulled. In not one of them, however, was the interpreted contract similar to the instant agreement. The nullities in some of the cited cases were decreed because of the existence of potestative conditions, one or more of the parties to each agreement having had the discretionary right of defeating it. In others the unexecuted portions of the contracts were declared void because of a lack of consideration therefor.

To the latter class belong Blanchard v. Haber, 166 La. 1014, 118 So. 117, and Cloverland Dairy Products Co., Inc., v. Grace, 180 La. 694, 157 So. 393, which are most strongly relied on by defense counsel. Each of those authorities involved a contract of employment in which the employee, in addition to agreeing to furnish his services for the duration of the contract, bound himself to refrain from committing certain specified acts for a period subsequent to the employment's termination. The court concluded that the post employment obligation was without consideration, and to that extent decreed the agreement to be a nullity.

The instant contract contains no provision relating to the furnishing of services or the use of the instrument after the termination of defendant's employment. Nor does it grant to either party the discretionary right to defeat the agreement, thereby creating a potestative condition. On the contrary, each person has a definite obligation to perform throughout the contracted period of time, that of plaintiff being to pay a fixed monthly compensa-

tion and that of defendant to provide his services and the exclusive use of the instrument.

Somewhat analogous to the present cause is Saunders v. Busch-Everett Co., 138 La. 1049, 1050, 71 So. 153. Therein it was held, to quote from the syllabus which reasonably expresses the court's holding, that:

"A contract whereby the owner of land grants to another, in consideration of payments, made and to be made, of certain agreed sums of money and other considerations which are to arise in a certain contingency, his right, or option, to drill for oil or gas within a year, and to extend the time thus granted, quarter by quarter, until it reaches a limit of 5 years, contains no potestative condition by reason of its failure to impose upon the grantee any obligation to drill, since it is not within the contemplation of the contract that he should drill, unless he so elects. The purpose is to confer the right to drill without imposing the obligation, and there is nothing in that purpose or in the nature of the contract which contravenes any law of this state."

The privilege of conducting surveys and exploration work for third persons was conferred on Pennington by the contract under consideration; but he was not obliged to perform operations of that kind, from which Drews insists large profits would flow. His obligation was to pay, as he has done, the stipulated consideration.

It is our opinion, therefore, that the assailed agreement is not predicated on a potestative condition or lacking in mutuality.

In contending that plaintiff has an adequate remedy at law and can not suffer irreparable injury, which is the second ground for the exceptions of no right and no cause of action, defendant directs attention to the provision of the contract that imposes on Drews a penalty of $25 per day for his failure to perform certain described duties. Also, he refers us to the prayer of the petition in which plaintiff asks judgment against Drews "in the sum of $4,850, representing the accrued penalties down to the date of the filing of this suit, and expressly reserving unto petitioner the right to collect any additional penalties which may thereafter accrue, and to assert any additional claim for damages which has resulted, or may result, from the action of the said T. J. Drews, herein complained about." Then defendant argues that plaintiff is not entitled to obtain both the penalties and the injunction; and that since he has prayed for the penalties with reservation to claim future damages, which shows that no irreparable injury will be suffered, he is without right to the injunction.

Irreparable injury justifying an injunction is that which can not be adequately compensated in damages, or for which damages can not be compensable in money. If the penalty stipulated in the instant contract represented the damages which might be sustained by Pennington on the breach of defendant's principal obligation, clearly irreparable injury could not occur and no injunction would lie.

But such penalty is not of that nature or status. The $25 per day provision is merely an incidental item and is not coextensive with the broad basis of interest which exists in favor of plaintiff under the contract.

As is well and correctly stated in the brief of plaintiff's counsel:

"* * * By its express terms this paragraph was inserted specifically to anticipate and to offset the overhead expense such as engineering, drafting, geological, transporting, charting, interpreting and general office expenses as is required in work of this nature to which applicant [plaintiff] might be subjected where any work is unduly delayed because of defendant's refusal or neglect to undertake the work promptly. It is plain that this penalty, if it may be so termed, is not intended to be equivalent to a liquidated damage clause, or intended to represent satisfaction in dollars and cents of all of applicant's interest under the agreement. This is shown by the provision of the same paragraph that in addition to the $25.00 penalty the defendant is responsible for any damage the applicant might sustain. (Brackets ours.)

* * * * * *

"The specific allegation is made that the instrument or device has just now reached the state of development where it can be profitably applied to the purposes for which it was intended. Since that purpose has to do with geophysical work related to oil exploration it goes without saying that the benefits the applicant might derive from the contract, if he is properly protected, are incalculable. The $25.00 item is not a drop in the bucket by comparison. Yet it is equally plain that it is impossible for these benefits to be determined with any degree of certainty at this time, and at any time unless the relief sought in this proceeding is granted. It goes without saying that applicant could not bring a suit in damages now, and that he will not be able to bring a suit in damages hereafter in which he could allege and show with any degree of certainty what damages he has suffered. Where such is the case and where the damages would be in any event occurring from time to time in the future a situation for the application of the relief here sought is presented."

Under the factual allegations of the petition, as well as the provisions of the contract, plaintiff, in our opinion, has no adequate remedy at law for the protection of his rights and interests.

With reference to the third ground for the exceptions, defendant, to quote from the brief of his counsel, contends:

"Plaintiff is seeking to enjoin defendant individually and personally from rendering or attempting to render to anyone else personal or other services of the nature covered and contemplated in said contract. It is horn book law that injunction will not lie on personal service contracts unless the personal services are acts of a special, unique or extra-ordinary character or for such services by persons possessing special and extra-ordinary qualifications. The al-

legations of plaintiff's petition show that plaintiff, as well as defendant, has full knowledge of the principal and of the method of operation of the instrument. Therefore, the services of Drews cannot be said to be acts of a special, unique or extra-ordinary character or that Drews possesses special or extra-ordinary qualifications."

Assuming for the purpose of this consideration the correctness of the law as thus announced, we conclude that the services of defendant, under the plain provisions of the contract, are of a special, unique and extraordinary character. True, as pointed out above, plaintiff is familiar with the instrument and has knowledge of the method of its operation; however, the written agreement recites that, "The Atomiscope or instruments referred to herein shall at all times remain the property of said T. J. Drews and shall at all times be in his possession and be operated by him personally * * *." Any attempt by Pennington, or by others under his instructions, to operate the device would constitute a violation of that recital.

For the reasons assigned the writs granted herein are made peremptory, and it is ordered, adjudged and decreed that the judgment of the district court be annulled and set aside, that the exceptions of no right and no cause of action be overruled, that the temporary restraining order heretofore issued be reinstated, and that the case be remanded for further proceedings according to law and not inconsistent with the views herein expressed. Costs

of the proceedings in this court shall be paid by defendant, and all others shall await the final determination of the cause.