PONDER, Justice.
 

 The plaintiff, C. B. Pennington, brought suit against the defendant, T. J. Drews, seeking to enjoin the defendant from doing certain acts in violation of a written contract. The suit was dismissed on exceptions of no cause or right of action by the lower court. Upon review, by way of writs, this Court set aside the judgment and remanded the case to be heard on its merits. Pennington v. Drews, 209 La. 1, 24 So.2d 156. After the case was remanded, the defendant filed a supplemental and amended answer pleading the lapse of five years from the date of the execution of the contract under the provisions of Article 167 of the Revised Civil Code. The matter was submitted upon the pleadings and a stipulation of facts entered into by the litigants. The lower court sustained the plea and denied the preliminary injunction on the ground that the contract was a personal service agreement and cannot be enforced after the lapse of the five year period as provided in Article 167 of the Revised Civil Code. The plaintiff applied for and obtained writs. The matter is now submitted for determination.
 

 There is no dispute over the facts in this case. The case was submitted on the pleadings, annexed instruments, and a stipulation of facts. When the case was presented to us on the exceptions, the contents of the contract was cited at length. See Pennington v. Drews, supra. For the purpose of this decision we see no necessity to recite in detail all the provisions in the contract.
 

 The defendant, respondent, invented an instrument or device which is designated as an “Atomiscope”. It is an electrical instrument used in geophysical work to determine the presence of structure or fault favorable for the accumulation of oil and gas. The respondent, desiring to become employed and associated with some one having knowledge of the exploration and development of minerals in order to conduct geophysical surveys' and test the merits of his invention, entered into a contract with the relator, who had approximately 20 years experience in the oil business. At that time the merits of the instrument had not been proven and the respondent, due to financial difficulties and inability on his part to make the proper contacts, had been unable to develop the device. He entered into the contract with the respondent because it would give him opportunity to improve the device and to demonstrate its practical and commercial value as well as to reap the benefits derived
 
 *275
 
 from the contract. Under the terms of the contract, the respondent was the sole owner and had the exclusive control of the device. The device was to remain in the possession of the respondent at all times and to be operated by him personally. Any improvement or new' discoveries affecting the device was to inure to the benefit of the contract. The respondent was to be ready and willing at all times to do survey or exploration work with the device whenever called upon. The respondent agreed never to purchase, directly or indirectly, any leases in any area surveyed in accordance with the contract without the relator’s consent. The- respondent was not responsible for any debts contracted or for the repayment of any expenditures made by the relator. The respondent bound himself not to use the device for any one without the written consent of the relator. He further agreed not to divulge any information obtained by a survey or that a survey had been made without'.the consent of the relator. Under the terms of the contract, the surveys were to be made only on leases obtained by the relator. Under the original contract the respondent paid the defendant $300 per month for a period of time and $400 per month after a lapse of a certain period of time and traveling expenses plus a 1/28 overriding royalty on' all leases that the relator might acquire. The contract further provided for the deduction of $25 per day from the salary of the respondent in case respondent delayed or refused to work with or take the device out when called. A supplemental agreement was entered into on February 6, 1941, amending the terms of the contract as follows:
 

 “On or before January 7th, 1942, the said C. B. Pennington shall have the right and option, by so notifying' the said T. J. Drews in writing, to extend this contract for an additional twelve (12) months, by the payment of Three Hundred Fifty and No/100 ($350.00) Dollars per month, as salary, to the said T. J. Drews. In like manner (by notifying the said T. J. Drews in writing on or before the 7th day’ of January of each year) and like payments, ($350.00) per month, this contract may be extended for successive periods of twelve (12) months each, not exceeding ten (10) years from and after January 7th, 1942.
 

 “In addition to the above mentioned salary, the said C. B. Pennington agrees to carry the said T. J. Drews for twenty-five (25%) per cent of the net profits, (by this is meant, 25% of the profits after paying all office rent, office help or office expenses of every nature, advertising, traveling or car expenses, salaries, lease costs, commissions, interest to others, interest on borrowed money, legal, accounting, general operating, equipment, development, experimental, marketing, taxes of all nature and kind, both state and federal, or any other expenses connected with said operations, and in addition thereto allowing C. B. Pennington a salary of Five Hundred and No/.OO ($500.00) Dollars per
 
 *276
 
 month), derived by C. B. Pennington as a result of any contract work, surveys or exploration work conducted for any company or individual, other than C. B. Pennington. The manner, method, form or time of securing or deriving at, and receiving said profit, as well as any and all operations, of every nature and kind shall be left to the sole and final judgment and discretion of the said C. B. Pennington.
 

 “In lieu of any interest or percentage of the profits as hereinbefore set forth, should the C. B. Pennington purchase any oil leases for his account, after the area having been first surveyed out with the Atomiscope and mapped after January 6, 1942 as favorable for production of oil, and the lease having been purchased entirely and directly as the direct results of said survey, then and in that event the said C. B. Pennington shall and is given the election, based on the full fee ownership, of carrying the said T. J. Drews for a seven and one-half (7i/j%) carried working interest (by this is meant seven and one-half (7j^%) per cent of the final net profits derived by C. B. Pennington after deducting all costs of lease, commissions, interest to others, legal, salaries, office, traveling, accounting, operating, equipment, development, marketing, taxes or any and all expenses of every kind and nature connected with said lease and its operation), or a one one hundred ninety-second (1/192) carried overriding royalty interest, or a proportionate combination of both. Should the said Pennington purchase any leases in any area surveyed and mapped prior to January 6, 1942, which period shall be treated as an experimental period,, nothing herein shall apply thereto.
 

 “The said C. B. Pennington shall also-have the right of subdividing or segregating any given lease and under a portion or portions carry the said T. J. Drews for an overriding royalty while on the other portion or portions carry the said T. J. Drews for a working interest in the amount and conditions as set forth immediately above.
 

 “In the event of a sale of any lease carrying a working interest, at the election and entire discretion of C. B. Pennington shall and is hereby given the right to sell all. of the interest and substitute therefor seven and one half (7j^%) per cent of the final net profits derived by the said C.. B. Pennington from that particular lease..
 

 “This carried interest or percentage shall only cover the area as mapped as-favorable for production of oil and the-lease surveyed and mapped after January 6, 1942.
 

 “When the said T. J. Drews has been paid an aggregate total sum of twenty five thousand and No/100 ($25,000.00) Dollars,, then and in that event the carried working interest shall automatically be reduced to three and three-fourths (3 3/4%) per cent, and the carried overriding royalty interest shall automatically be reduced to one three hundred eighty-fourth (1/384).
 

 “The proposed carried interest or percentage of the profits or carried overrid
 
 *277
 
 ing royalty interest is not to be construed as being any undivided interest, partnership or ownership in and to any lease or leases or operations, but only a percentage of the final net profits or interest of the said C. B. Pennington, and its distribution shall be left to the sole and final discretion and judgment of the said C. B. Pennington.
 

 “The said T. J. Drews shall not be responsible for any debts contracted or be called upon to pay or repay any expenditures the said C. B. Pennington might spend or direct to others to spend under the contract dated October 7, 1940.”
 

 In the stipulation of facts, various documents and letters attached to the petition were admitted to be true and authentic and to be considered as evidence by the court. These documents include the original contract, the supplemental contract, and a number of letters showing the relator had complied with the contract and that relator had timely taken the necessary steps to have the contract extended. It is admitted that the respondent, prior to his becoming interested in inventing various devices in discovering minerals, was engaged in the business of coffee salesman. From October 1, 1940 to December 3, 1942 the relator conducted geophysical surveys and the respondent used and operated the device in these surveys whereby 230 wells were drilled and their results observed. It appears from the stipulation of facts that the respondent, from December, 1942 to December, 1943, operated under the contract approximately 85 days. The respondent underwent an operation', during February, 1944 and was physically incapacitated for a period of 60 days to do any work under contract, but at all other times was physically competent to do so if required. The relator has been engaged in the oil business, individually and as a broker, for some 20 years in such a way as to become familiar with the development of oil and the methods employed in such enterprises. At the time the contract was entered into the respondent represented to the relator that, due to financial difficulties and inability on his part to make the proper contacts, he had been unable to develop the device and desired to become employed and associated with the relator, who was familiar with the exploration and development of minerals and had numerous contacts; in order that the merits of his invention might be further advanced; in order to improve upon the methods for operating the device and to further demonstrate its practical and commercial value, as well as reap the benefits therefor. After the respondent demonstrated the instrument to the relator, who assisted him in its use and operation for a limited period of time, it was found that the device offered some prospect for practical and helpful usage in making geophysical tests. The principle and method of operation of the device is unknown to the commercial and scientific world and is known only to the relator and respondent. The inner-workings
 
 *278
 
 and construction of the device is known only to the respondent. It appears that the device detects the areas of oil sands and various minerals. The original contract of October
 
 7,
 
 1940 was complied with by both parties until the amendment of it on February 6, 1941. Thereafter the contract, as amended and extended, was complied with by the parties up to and inclusive of January 6, 1944, except for a short period of time when the respondent was granted a leave of absence. The respondent was incapacitated following his operation of February 15, 1944 for a period of 60 days. Since recovery from his operation, he has refused to comply with the contract. The relator addressed two communications to him, one in April and one in May, insisting upon his compliance with the contract, without avail. Prior to October
 
 7,
 
 1940, Pennington, in cooperation with Drews in the invention and development of a similar ■device, expended more than $5,000 of his personal funds. When the contract was first entered into, the device had not been developed to the point where it had any practical or commercial value and it was not until the first part of 1942 that it be,gan to obtain a satisfactory degree of proficiency. It is admitted that the relator, in addition to paying the respondent the regular salary, has expended large sums •of money, running into thousands of dollars, to provide the expense and overhead for hundreds of surveys and to complete •tabulations thereof that were made for no other purpose than to improve the method of operating the device and to demonstrate its commercial and practical value. It is admitted that the respondent had little knowledge, at the time the contract was entered into, as to oil exploration and no knowledge of mapping and survey recordings whatever; that he had no contact with oil men or oil companies to speak of and no background that would have enabled him to carry out these experiments without relator’s cooperation; and that as a result of these efforts which the relator materially contributed in, the method of operating the device was vastly improved until highly satisfactory results were obtained. A record was built up and recorded under the relator’s direction and supervision of a nature which demonstrated to the oil fraternity generally the highly desirable advantages in geophysical work carried on with the benefit of the device. The relator has not received any return commensurate with the time and money which he has invested under contract. The relator has at all times complied with the contract and cooperated with the respondent by minimizing his personal responsibilities; by decreasing the amount of work required of him; by paying him advances in salary in excess of sums due; by agreeing to train and substitute respondent’s son for such personal service that might be required so as to relieve the respondent as much as circumstances would permit; by recognizing all and reasonable excuses for failure to work at any given time; by
 
 *279
 
 granting him leave of absence when it was requested; and by generally making such other concessions as were necessary to accommodate him personally, in order to make his work easy and the results obtained satisfactory and valuable.
 

 The relator is seeking in these proceedings to enjoin the respondent from rendering any services, personal or otherwise, of the nature contemplated in the contract to any one other than the relator; from using or attempting to use the device and improvements or any other device based on the same principles for the benefit of any other person; from making a new device and using it for the benefit of any other person; and from removing or allowing any one else to remove the device and its improvements from the State.
 

 Article 163 of the Revised Civil Code provides as follows: “Free servants are in general all free persons who let, hire or engage their services to another in this State, to be employed therein at any work, commerce or occupation whatever for the benefit of him who has contracted with them, for a certain price or retribution, or upon certain conditions.”
 

 Article 167 of the Revised Civil Code provides: “Persons who have attained the age of majority cannot bind themselves for a longer term than five years.”
 

 The judgment of the lower court is based on Article 167, R.C.C. and the holdings in the cases of Page v. New Orleans Public Service Inc., 184 La. 617, 167 So. 99; Hill v. Missouri Pacific Ry. Co., D.C., 8 F. Supp. 80; Shaughnessy v. D’Antoni, 5 Cir., 100 F.2d 422; and Caldwell v. Turner, 129 La. 19, 55 So. 695.
 

 From an examination of the cited authorities, we find that they deal with personal service contracts. Such being the case, they are not pertinent to the present controversy. If the contract under consideration involved only the question of personal services, the quoted articles of the Civil. Code and the decisions cited would be pertinent and decisive, hut this contract involves more than personal services. In fact, the agreement is in the-nature of a joint enterprise or joint adventure. The respondent, who had no experience in the oil business and who had invented a device which he believed would detect or locate oil or other minerals, approached the relator, a man experienced in the oil business, in order to obtain an opportunity to test and develop his device and entered into a contract for the mutuaL benefit of both parties. The primary object of the contract was the discovery of minerals with the device. The services of the-respondent were incidental to the main, purpose of the contract. The clause in-the contract providing that the ownership-of the device was to remain the property of the respondent, remain in his possession, and to be operated by him personally was for respondent’s benefit and protection.. His services were not essential to the fulfillment of the main purpose of the contract for another person could have beert.
 
 *280
 
 trained to operate the device. In fact, Pennington suggested that Drews’ son be trained to operate the device, but Drews would not agree to this. There is no attempt made to fetter Drews’ freedom. If he desires to operate the device himself and not permit any one else to operate it, it cannot be said that Pennington is fettering Drews’ freedom. Under the circumstances in this case, it would be manifestly unfair to permit Drews to withdraw from the contract after receiving benefits and the improvement of his invention at the enormous expense of Pennington, simply because Drews will not permit the device to be operated by another. He cannot under the circumstances avoid his engagement simply because he received a salary and rendered personal services during the engagement, especially when there is no attempt made to fetter his freedom. If Article 167, R.C.C. were applicable to a contract where one of the parties rendered personal services in a joint adventure or during the life of a contract, it would prevent a person of meager means who had something of prospective value from engaging in such. In this case Drews would not have been able to carry out his part of the venture without sufficient means to live on. It is extremely doubtful whether he would have been able to interest another person possessing Pennington’s experience and financial backing in joining such an enterprise. His device at that time had not been perfected and it was uncertain whether it could ever be improved to such an extent as to have a practical or commercial value.
 

 The decisions cited in support of Drews’ contention are to the effect that an adult cannot bind himself longer than five years but can perform for the sixth year if he is willing to do so, which is wholly optional with the employee. Under the facts in this case it is. optional with Drews whether he renders the services or not. He is not compelled to render the services and could permit another to be trained to render the services essential to carry out the purpose of the contract.
 

 We have been unable to find any decisions of this Court where Article 167 has been applied to any contract except those involving strictly personal services. This article would not be applicable, in our opinion, to a joint enterprise or contract where mutual benefits are received. However, if it were applicable, the freedom of Drews has not been fettered. He has the option to render the services or permit some one else to do so. Moreover, the court is not asked to compel the respondent to render any personal services in this suit.
 

 For the reasons assigned, the judgment of the lower court is reversed and set aside; the plea that the contract was no longer binding on account of the lapse of five years, under the provisions of Article 167 of the Revised Civil Code, is denied. The writs are made mandatory and the temporary restraining order is reinstated.
 
 *281
 
 according to law and consistent with the views herein expressed. The cost of the proceedings in this Court to be paid by the respondent. All other costs to await the The case is remanded to be proceeded with final disposition of the cause.